**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0931-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEFFREY T. HARLEY,
a/k/a WILLIAM MELLY,

    Defendant-Appellant.

_____

Argued December 9, 2024 – Decided December 17, 2024

Before Judges Sabatino, Gummer, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-11-1411.

Daniel S. Rockoff, Assistant Deputy Public Defender argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney for appellant; Daniel S. Rockoff, of counsel and on the briefs).

Patrick F. Galdieri, II, Assistant Prosecutor argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the briefs).

PER CURIAM

Defendant Jeffrey T. Harley appeals his conviction of murder and other offenses after his 2019 jury trial. The primary argument he raises on appeal is that the trial court erroneously allowed the jury to hear unwarned statements he made during an interview at the police station two days after the victim's death. Defendant argues the interview was a custodial interrogation that required Miranda[1] warnings.

The trial court concluded after a Rule 104 testimonial hearing that the interview was not a custodial interrogation. The court advised counsel it was prepared to explain its reasons on the record if requested, but counsel made no such request. Since that time, the admissibility of the interview has become a critical issue on appeal.

For the reasons that follow, we remand the custodial interrogation issue to the trial court for a statement of its reasons, this time with the benefit of a transcript of the testimony at the Rule 104 hearing and courtesy copies of the extensive briefing on the issue the parties have presented on appeal. The trial

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0931-20

court shall also reconsider its assessment of the issue in light of New Jersey case law that has since illuminated custodial interrogation and <u>Miranda</u> issues.

I.

For the limited purposes of this interim, pre-remand opinion, we need not discuss the facts comprehensively. We note the case was tried two times, as the first trial ended in a mistrial. The following facts are derived from the record of the second trial.

### The Underlying Incident

On February 6, 2016, eighty-one-year-old Lucila Cardenas Viejo was beaten and stabbed to death in her apartment at 64A Lexington Avenue in Jersey City. Evidence from the crime scene included a variety of "blood swipes," two bloody knives, a shoe print, and surveillance footage.

The State was not able to link the blood samples or shoe prints to defendant, but video footage from both the exterior and interior of Viejo's home, and from a neighbor's property, could be viewed as suggesting Harley's possible involvement.

The camera outside of 64A Lexington Avenue showed at approximately 9:59 p.m., a hooded and masked individual approach Viejo's front door. The video showed the hooded individual unsuccessfully attempt to unlock the front

A-0931-20

door with a key. Viejo's son, Armando Solorzano ("Armando"[2]), said Viejo kept a spare set of keys by flowerpots outside of the outer door, but Armando testified that the locks had been changed and that the keys in the flowerpot no longer fit the current lock. The video then showed the individual briefly leave the porch only to return and ring the doorbell. Then the main front door opens, and the individual rushes through the main door into the vestibule. Armando testified that not many people had a key to Viejo's apartment, and that Viejo would not open the door for someone she did not recognize through the security monitor or peephole on the door.

The camera inside the hallway showed the hooded and masked individual behind Viejo push her further into her apartment. It also showed the hooded individual turning off the lights and leaving the home a short while later.

A security camera across the street from Viejo's home at another residential address, 57 Lexington Avenue, next to defendant's house, showed, at approximately 10:36 p.m., Viejo's front porch lights turn off, the hooded individual exit the front door, turn left, and walk down and across Lexington Avenue with a bag. Two minutes later, at 10:38 p.m., it showed an individual

---

[2] We refer to the son by his first name for clarity, consistent with the briefs. No disrespect is intended.

A-0931-20

walk down Lexington Avenue in the opposite direction with a bag in hand and turn into the front gate of 61 Lexington Avenue—the home of defendant.

The "Field" Interview

On February 7, 2016, the day after Viejo's death, Officer Sherika Salmon of the Hudson County Prosecutors Office ("HCPO") approached defendant after she noticed him standing outside of his home observing the officers investigate the crime scene. According to Salmon, defendant identified himself as "Jeffrey Olden," spelling the name for the officer as she wrote it down. Defendant told Salmon that he worked for "Blue Apron" in Jersey City and that he had just gotten off work and heard of the incident from his neighbors that morning. Salmon called Blue Apron to confirm these details and learned that Blue Apron did not employ anyone by the name of Jeffrey Olden or Jeffrey Harley.

The Police Station Interview

HCPO Detectives Guershon Cherilien and Willy Caicedo testified at trial that on February 8, 2016, two days after Viejo's death, they interviewed Harley. According to Cherilien, he called Harley and suggested that he come to the HCPO to give a voluntary statement as a witness, and he agreed to do so. Cherilien and Caicedo testified that they picked up Harley at his request because he did not have transportation and drove him to the HCPO's homicide unit and

placed him in an interrogation room. The interview was video recorded and later transcribed.

At the outset, Cherilien advised Harley that he was there to "answer[] questions concerning [his] knowledge of a matter now under investigation involving the death of Lucila Cardenas Viejo," and Harley orally affirmed that he was willing to reply to questions. Cherilien then placed him under oath and told him that "[t]his oath carries the same responsibility as a[n] oath that you would swear before a grand jury or a trial. Violation of this oath constitutes the charge of perjury."

Cherilien testified that when he conducts an interview with someone as a suspect, he first gives Miranda warnings to the individual and advises him of his rights. Cherilien did not Mirandize Harley at any point during the interview and testified that he had not done so because he considered Harley to be a witness not a suspect.

During the interview, Harley said that he last recalled seeing Viejo on the afternoon of Saturday, February 6, 2016. The detectives then asked him to "walk [us] through your Saturday." Harley told the detectives that he had woken up late and watched television until his cousin Will came over, and then the two of them went to a chicken restaurant near his home. Harley then told the detectives

that later that evening, close to 9:15 p.m., he had left his house in black pants and black boots, went to a local bar, ordered a shot of gin, and sat and drank for approximately thirty minutes. Harley said he left the bar and ran into one of his neighbors, and the two of them went back to the same bar and ordered more drinks. He then stated he went to a Chinese restaurant and ordered food, before heading straight home.

The detectives then showed Harley a freeze frame from the 57 Lexington Avenue footage that depicted a person walking into his driveway and front yard. Caicedo told Harley, "we see the individual actually come over here and go right into your driveway. So we're trying to figure out—you're 100 percent that that's not you?" Harley replied that it was not him, to which Caicedo responded "[w]e're not suggesting that you did anything[,]" and that the detectives were "not railroading anything here," but "[i]f that's not you, then what we're trying to see is—if you know this individual because he clearly goes into your driveway like he knows the place." (Emphasis added). Caicedo also noted that Harley was "getting, like, nervous . . ." as the interview progressed and the detectives pressed him on the evidence that showed someone walking up his property.

The detectives then left the room for approximately six minutes to speak with their sergeant. At one point after they returned, Cherilien told Harley that

A-0931-20

"when we met you yesterday, . . . there were some [dates] that you told us that didn't add up. So that's why it kind of threw us off. We weren't sure if we were dealing with . . . a friend or foe." The detectives confronted him about his allegedly telling Salmon that he worked at Blue Apron and that his name was Jeffrey Olden, neither of which were true. Harley replied this was likely a mistake on the officer's part, as he recalled telling her that he worked in Bayonne and that his name was Jeffrey Harley. After asking whether Harley had anything to add to his statements, Caicedo questioned whether he was ever in Viejo's house, purportedly to "put [his answer] on the record because I know somebody will ask it." Harley said that he had never been inside.

<u>Use of Harley's Statement During the 2019 Trial</u>

In its summation on May 8, 2019, the State played back the recording of the February 8, 2016 interrogation and substantially framed its arguments around Harley's statements:

> You know what [] [Harley's counsel] didn't bring up during his summation? The defendant's statement. Why is that? Because, ladies and gentlemen, it was replete with lies. And we're going to prove to you, and we're going to show you how he lied throughout his statement, and how his story fell apart.
>
> . . . .

And we're going to watch his statement, so you can tell. And ladies and gentlemen, part of your role as jurors is to judge a person's demeanor, how they are reacting to certain questioning. Okay? And you're going to see how his story completely falls apart, step, by step, by step.

. . . .

If you're searching for one last bit of evidence that leaves you firmly convinced, then I leave you with the defendant's own words. ["]I'm 110 percent sure that's not me.["]  If he lied, he is guilty.  It shows what is called a consciousness of guilt.  He knew it was him on that video, and his story began to fall apart . . .  You're going to go back into the jury room, and you're going to have all the exhibits.  If you want to listen to any of the testimony, you can ask for it.

[(Emphases added).]

During deliberations on May 9, 2019, the jury requested to have the February 8, 2016 interrogation replayed.  The court agreed to the request and the jury watched the interview in its entirety.  The jury returned a guilty verdict that same day.

<u>This Appeal and the Belated Discovery of the Rule 104 Hearing</u>

Harley appealed his conviction on several grounds.  His main argument is that the police-station interview was a custodial interrogation that required <u>Miranda</u> warnings.

Initially, both appellate attorneys mistakenly believed that defendant's trial counsel had not objected or otherwise sought to suppress any of his stationhouse interview. However, at the first oral argument on appeal on September 30, 2024, the court requested counsel delve into the procedural history more extensively. Subsequently, counsel discovered that defendant's trial counsel had, in fact, objected to the admission of his statements from the police interview and that the trial court conducted a Rule 104 hearing on the motion before the first trial. The Rule 104 hearing and other pretrial proceedings were then transcribed at our direction. Appellate counsel filed supplemental briefs and reargued the issue in light of these transcripts.

Specifically, three relevant pretrial proceedings took place on September 8, 2017, December 14, 2017, and January 5, 2018, which have now been transcribed.

On September 8, 2017, the parties appeared before the trial judge for a pretrial status conference before the first trial. The State moved for a Rule 104 hearing on the admissibility of Harley's non-Mirandized recorded statement to the police. Defense counsel concurred that the State would need to carry its burden at the Rule 104 hearing.

Next, on December 14, 2017, the parties appeared for the Rule 104 hearing

10

A-0931-20

regarding defendant's February 8, 2016 interview. The State presented testimony from Detective Cherilien, who was cross examined by defense counsel.[3] The court reserved decision. It offered counsel the opportunity to file post-hearing briefs on the issue, but counsel declined the offer.

On January 5, 2018, at the outset of a Rule 104 hearing about a different witness's statements, the trial court orally announced its ruling on the admissibility of the stationhouse interview. In full, the court stated:

> I've indicated in chambers my ruling on this prior statement, the hearing on December 14th. I would permit the State to use that. I can amplify my reasons if necessary. But certainly, based upon my review of the transcript record, the testimony, DVD, there was no custodial interrogation.

No request for amplification was made. Moreover, no amplification was provided by the trial court after the present appeal was filed.

Defendant argues the trial court erred in admitting the interview, asserting that, upon a careful application of the pertinent case law, the session was a custodial interrogation notwithstanding the subjective contention of the officers that defendant was "free to leave" the interview. In his main brief, defendant cites thirteen reasons in support of this argument including, among other things,

---

[3] The officer's testimony at the pre-trial hearing was substantially the same as his eventual trial testimony.

A-0931-20

that he was driven to the police station in a police car, placed in a small interrogation room, outnumbered by detectives who sat between him and the exit, and he was never told he was free to leave. The State counters that, under the totality of circumstances, the trial court correctly found the interview session was not a custodial interrogation.

## II.

It is essential to the process of appellate review that trial courts provide sufficient reasons for their decisions. See R. 1:7-4; see also Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:7-4, at 79 (2025) (emphasizing that the Rule "requires findings to be made on all motions decided by written orders appealable as of right," and the "critical importance of that function"); Vartenissian v. Food Haulers, Inc., 193 N.J. Super. 603, 611–12 (App. Div. 1984).

In this instance, the court's conclusory announcement at the outset of the January date proceeding is inadequate. Although the court alluded to a discussion in chambers that preceded the oral announcement, the discussion was not recorded or transcribed.

Because the admissibility of defendant's interview is the primary issue on appeal, it is important to have the benefit of the trial court's reasoning. The trial

court was in the unique position to evaluate, among other things, the credibility of the testifying detective.

We recognize that several years have passed since the Rule 104 hearing. The existence of the hearing was only recently discovered by appellate counsel. We trust that with the benefit of the transcripts and courtesy copies of the briefs submitted by counsel, as well as the video recording of the interview, the trial court will be able to endeavor to refresh its recollection of the hearing. Defense counsel shall expeditiously supply the trial court with the transcripts, all appellate briefs, and the interview recording within seven (7) days.

In revisiting the admissibility issue, the trial court shall consider (as counsel have agreed) intervening case law that may guide its analysis, including State v. Bullock, 253 N.J. 512, 538 (2023) (concluding objectively that a defendant interviewed by police in a college courtyard was not "free to leave" and therefore his interview was a custodial interrogation). The court shall address the specific points raised by defendant and the counterarguments presented by the State. The court is free to reconsider its original ruling, including the possibility that what began as a non-custodial interview might have evolved into one. We intimate no views about the outcome.

Although defendant during his unwarned police station interview did not confess to the victim's killing, as we noted above, the State emphasized during its summation what it characterized as a host of false statements he made during that interview. The State argues that even if, hypothetically, the interview was deemed a custodial interrogation requiring Miranda warnings, the admission of those statements at trial was harmless error. Defendant maintains the interview, which the jury asked to have played back during its deliberations, was highly prejudicial and that it was plainly harmful to admit it. See State v. Wade, 252 N.J. 209, 220 (2022) ("[W]e rarely find an error to be harmless when the State violates a defendant's right against self-incrimination."). We need not resolve this harmful-error issue at this time and instead await the outcome of the remand.

The trial court shall issue its remand decision with amplified reasons, preferably in a written opinion, by no later than February 3, 2024. Within twenty (20) days of that decision, defendant may file an amended notice of appeal, or the State may file a cross-appeal, depending on the outcome. The court will then issue an expedited briefing schedule to enable the appeal to be re-calendared before the end of this Term.

Remanded in accordance with the terms of this opinion. We retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14

A-0931-20